# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

CASE NO.:

SURGERY CENTER OF VIERA, LLC,

     *Plaintiff*,

v.

UNITEDHEALTHCARE INSURANCE COMPANY,

     *Defendant*.

_____/

## COMPLAINT

Plaintiff, Surgery Center of Viera, LLC ("SCV"), as medical provider, authorized representative, and assignee of patient / insured, T.S., sues Defendant, UnitedHealthcare Insurance Company ("UHC"),[1] as follows:

## NATURE OF THE ACTION, PARTIES, JURISDICTION, AND VENUE

1.    This action arises under state law for Defendant's wrongful, unsubstantiated decision to underpay SCV for medical services SCV provided to the patient / insured, T.S., on March 27, 2018, which such claim underpayment decision (a decision made entirely by UHC, seemingly not Advanced Inspection

---

[1] The 2018 plan document / insurance policy that SCV possesses is attached hereto as **Exhibit A** and incorporated fully herein by reference. This plan appears to be fully insured; hence, the employer (Advanced Inspection Technologies, Inc.) not being included as a co-Defendant in this matter. But, if someday it is shown otherwise (*i.e.*, if someday it is shown that Advanced Inspection Technologies, Inc. is a plan sponsor and / or plan administrator and / or the like, even though SCV cannot spot as much in Exhibit A), SCV would respectfully request leave to amend this Complaint to name additional Defendant(s).

Technologies, *see* n. 1, *supra*)[2] did not flow from a (mis)interpretation of the plan document / insurance policy itself, but instead emanated from UHC's failure to honor the payment rate structure established by a third-party re-pricing contract / agreement separate and distinct from the insurance policy / plan document itself; *e.g.*, Preferred Medical Claim Solutions ("PMCS") re-pricing rates, *see* n. 2, *supra* ("UHC may assign this authority to other … entities," like PMCS).

2.      At all material times, SCV was a medical provider and a Florida limited liability company with its citizenship (*i.e.*, principal place of business / "nerve center") in Viera, Florida, Brevard County. SCV is *sui juris* in all respects. SCV's members are as follows: (a) Dr. Ara Deukmedjian, domiciled in Brevard County, Florida, (b) Sun Deukmedjian, domiciled in Brevard County, Florida, and (c) Dr. Bharat Patel, domiciled in Brevard County, Florida. At all material times,

---

[2] The reality that UHC was / is the sole claim and benefits payment decision-maker is also evidenced in the plan document / insurance policy:

> [UHC has] the final authority to do all of the following:
>
> - Interpret Benefits under the Policy.
> - Interpret the other terms, conditions, limitations and exclusions set out in the Policy …
> - Make factual determinations related to the Policy and its Benefits.
>
> [UHC] may assign this authority to other persons or entities that provide services in regard to the administration of the Policy.

Ex. A, COC.INS.2018.SG.FL at 53.

In this same vein, the insurance policy (Ex. A) also states that "Allowed Amounts are determined by [UHC] as shown in the Schedule of Benefits." *Id.* at 58. In this same vein, the insurance policy (Ex. A) also states that "Allowed Amounts are the amount [UHC] determine[s] that [UHC] will pay for Benefits." Ex. A, SBN.CHP.I.2018.SG.FL at 35. *See also* nn. 7-8 and Ex. H, *infra*.

SCV was the authorized representative of T.S. with an assignment of benefits as well,[3] having provided subject medical services to T.S. for which a proper amount of compensation is due and owing. UHC honored such authorized representative and assignee capacities by, for examples, carrying out pre-suit appeal with SCV (it was only UHC, nobody else, that engaged in pre-suit appeal processes with SCV) and tendering partial claim payment directly to SCV (it was only UHC, nobody else, who engaged in the partial claim payment process with SCV).

3.      At all material times, UHC was an insurance company with its state of incorporation and principal place of business / headquarters ("nerve center") in the State of Minnesota and engaged in the business of selling insurance, administering insurance (here, directly as to claim administration functions like payment amount), and / or deciding and paying insurance claims throughout the country, including in the State of Florida.

4.      This Court has jurisdiction over this dispute pursuant to Title 28, United States Code, Section 1332, as complete diversity exists between the Plaintiff and the Defendant and the amount in controversy exceeds $75,000.00 exclusive of interest, costs and attorney's fees.

5.      Venue is proper in the Middle District Court of Florida pursuant to Title 28, United States Code, Section 1391(b), since, for examples, (a) a substantial part of the events or omissions giving rise to the subject action

---

[3] All germane authorization and / or assignment paperwork in SCV's possession is attached hereto as **Exhibit B** (in redacted form) and incorporated fully herein by reference.

occurred in this jurisdiction, namely the subject medical procedure and Defendant's underpayment (both at the initial claim and subsequent pre-suit appeal stages) of the monies owed to compensate SCV for the valuable medical services rendered to T.S., and (b) the Orlando Division of this Court has personal jurisdiction due to Defendant's minimum contacts in this forum.

6.    All conditions precedent to the institution of this action (*e.g.*, administrative pre-suit appeals) have occurred, been performed, been waived, or were futile.

## COMMON ALLEGATIONS

7.    The UHC Group No. was / is GA9W5795BW. Again, a copy of the insuring agreement (which is separate and distinct from the PMCS re-pricing contract / agreement at issue in this lawsuit, *see* **Exhibit C** incorporated fully herein by reference, and whatever mystery re-pricing program UHC employed) is attached as Ex. A and incorporated fully herein by reference. Moreover, the (a) Health Plan ID No. was / is 911-87726-04, (b) Member ID No. was / is 938205075, and (c) UHC's Claim No. was / is 7077837068 0326870686.

8.    At all material times, T.S. was covered as evidenced by, for example, Defendant's payment of $1,810.51 in relation to $210,979.00 billed.[4] Regarding coverage of the subject HCFA codes, the April 13, 2018, EOB (which UHC calls a Provider Remittance Advice) furnished by UHC on UHC stationery (further

---

[4] The HFCA form was part of SCV's claim submission package to Defendant, which such claim submission package is attached hereto as **Exhibit D** and incorporated fully herein by reference. More specifically, the HCFA form can be found at page 3 of Ex. D.

discussed below) is attached hereto as **Exhibit E** and evidences the coverage decision. Ex. E is incorporated fully herein by reference.

9.      The UHC-issued EOB shows that UHC unilaterally re-priced the subject claim (*via* an unnamed third-party re-pricer, such as an Optum or a Viant or the like who UHC has used in the past) and did not deny any germane aspects of the claim on coverage grounds (*e.g.*, medical necessity, experimental / investigational); *i.e.*, did not engage in interpretation of the plan document / insurance policy (Ex. A) when claim decision-making as to the HCFA codes placed at issue in this case, specifically when deciding how much to pay out as to such codes.

10.     Again, UHC's re-pricing (*via* an unnamed third-party) resulted in payment of $1,810.51 to SCV in relation to the $210,979.00 billed by SCV.  To be abundantly clear, the payment delta is all that is in dispute in this pure rate of payment (*i.e.*, not right of payment; *i.e.*, not coverage) case.

11.     As discussed further below, it is SCV's position that UHC should have honored the separate and distinct PMCS re-pricing contract (*see* Ex. C) already in place between SCV and UHC. As discussed further below, under the PMCS re-pricing model (with PMCS being UHC's vendor, also discussed below and featured in another exhibit discussed below), the allowed amount should have ended up being $180,417.80 (which is 80% of non-implant line items featured on the HCFA found at page 3 of Exhibit D, and 100% of the implant line item featured on the HCFA). *UHC's decision to pay $1,810.51 (based on who knows what) breached the*

*subject PMCS re-pricing contract (Ex. C); hence, Count I sounding in breach of the PMCS re-pricing contract.*

12.    Notwithstanding pre-suit invitations, Defendant has never explained how $1,810.51 was unilaterally arrived at on subject HCFA line items billed at $210,979.00; *i.e.*, has never substantiated the unknown re-pricing contract, agreement, formula, or program of the carrier's unknown third-party re-pricer (again, such as an Optum or a Viant or the like).

13.    "Unilaterally arrived at" because the applicable PMCS re-pricing contract (that SCV had actually agreed to, unlike the unagreed to mystery re-pricing contract / agreement / formula / program) was already in place (*see* Ex. C).

14.    The re-pricing contract (Ex. C) that SCV maintains should apply here in determining the proper rate of payment was / is separate and distinct from the plan document / insurance policy (Ex. A) itself. Similarly, the mystery re-pricing contract / agreement / formula / program unilaterally implemented by Defendant in arriving at the disputed unreasonably low claim payment amount ($1,810.51 paid in relation to $210,979.00 billed) is also necessarily separate and distinct from the insurance policy / plan document itself (Ex. A).

15.    Application / implementation of the subject re-pricing contract (Ex. C) separate and distinct from the plan document / insurance policy (Ex. A) does not implicate interpretation of the plan document / insurance policy. Similarly, Defendant's application / implementation of a mystery re-pricing formula separate and distinct from the plan document / insurance policy did not implicate

interpretation of the plan document / insurance policy.

16. In sum, this action has nothing to do with coverage; *i.e.*, interpretation of any plan document / insurance policy language. Rather, this action revolves around Defendant's mistaken decision to underpay SCV on covered HCFA codes vis-à-vis Defendant's unilateral implementation of a mystery re-pricing contract / formula / program separate and distinct from the plan document / insurance policy (Ex. A); *i.e.*, Defendant's mistaken decision to not implement the previously agreed to PMCS re-pricing contract (Ex. C) also separate and distinct from the plan document / insurance policy.

17. The fact that this dispute has nothing to do with interpretation of plan document / insurance policy language is further evidenced by UHC's pre-surgery authorization of most (if not all) of the HCFA codes placed at issue in this litigation. *See* UHC's March 14, 2018, Authorization Paperwork (Auth # A041549247), Ex. D at 8-10.

18. At all material times leading up to the subject medical services received from SCV, T.S. suffered from 95% neck pain and 5% left upper extremity pain radiating from the cervical spine into the left shoulder and left arm with weakness, numbness, radiculopathy, and myelopathy. T.S. reported pain on the posterior aspect of the cervical spine associated with severe paraspinal tenderness and muscle spasms, and severe limited cervical range of motion and pain with rotation. T.S. had moderate stenosis, spondylolisthesis, cord compression, and radiculopathy. An MRI showed straightening of the cervical spine consistent with

kyphosis, cord compression at C4/5, C5/6, and C6/7 associated with moderate to severe stenosis and spondylolisthesis. An X-ray showed spondylolisthesis at C5/6 and C6/7. T.S. tried alternative, conservative management treatments, which failed and surgical treatment was accordingly deemed medically necessary by both SCV (as evidenced by, for examples, the "operative note," *see* Ex. D at 11-13, "history and physical," *see id.* at 5-7, and "letter of medical necessity for cervical spine surgery," *see id.* at 4, found in SCV's claim submission package, Ex. D) and UHC (as evidenced by, for example, the pre-authorization paperwork found within Ex. D, *see id.* at 8-10). So, on March 27, 2018, SCV operated on T.S. to remedy the medical conditions.

19.    By correspondence dated March 14, 2018, and prior to the subject procedure, UHC issued information to SCV approving surgical codes. *See* Ex. D at 8-10.

20.    As mentioned above, SCV's billed charges for the subject medical services rendered to T.S. totaled $210,979.00, *see* ¶¶ 8-12, *supra*, and a claim package was promptly submitted to UHC relating to same on (*via* certified mail, No. 7017 3040 0000 4572 3818), *see* Ex. D. The SCV cover letter to its claim submission packet is attached hereto as part of Ex. D (specifically, Ex. D at 1) and outlines SCV's appropriate expectation that claim payment would unfold (subject to patient responsibilities; *e.g.*, co-pay, co-insurance, deductible) pursuant to the re-pricing contract (*see* Ex. C, which prescribes an 80% rate for non-implant HCFA line items and a 100% rate for implant HCFA line items) that existed (not some

unknown third-party re-pricing contract that UHC would unilaterally employ), which, again, such re-pricing contract (even the yet discovered re-pricing contract / formula / program that UHC employed) is separate and distinct from the plan document / insurance policy (Ex. A) itself.

21.     At all material times, UHC was in agreement with re-pricer PMCS (as UHC's affiliate, subcontractor, vendor, agent, or the like), which such re-pricing contract was secured here in relation to SCV.[5] *See* **Exhibit F** attached hereto and incorporated fully herein by reference.[6]

22.     The PMCS allowed amount re-pricing contract (*see* Ex. C) was in full force and effect and was a legally valid and binding contract that established / developed (a) an allowed amount re-pricing rate of 80% of SCV's billed charges less patient responsibilities (*e.g.*, co-pay, deductible, co-insurance) subject to the patient's annual out-of-pocket maximum, and (b) a 100% reimbursement rate for hard costs (*e.g.*, prosthetics / implants). SCV does not dispute the amount of patient responsibilities determined by UHC in arriving at its claim payment amount, which such claim payment amount equals the allowed amount determined

---

[5]Again, a copy of the pertinent pages of the PMCS re-pricing contract that was procured on UHC's behalf (along with the PMCS "client" list listing UHC) are attached hereto as Ex. C. Again, Ex. C is incorporated fully herein by reference. Again, SCV made clear its expectation that the claim would be priced pursuant to the PMCS contract / agreement that was brokered by UHC with PMCS being UHC's vendor, agent, or the like tasked with achieving discounted rates from medical providers like SCV. The paperwork attached as Exhibit C is the SCV / PMCS side of the UHC / PMCS / SCV re-pricing contract. SCV does not yet possess UHC's side of the UHC / PMCS re-pricing contract arrangement because, as discussed below, UHC has failed to produce same.

[6] Ex. F is SCV's explanation of its understanding of how re-pricing programs through the likes of PMCS work. The patient's name is redacted from Ex. F. Moreover, SCV's providing Ex. F to the Court is not to be construed as a waiver of attorney-client privilege.

by UHC less patient responsibility amount determined by UHC. Rather, SCV disputes the allowed amount paid out by UHC's EOB in relation to SCV's HCFA, with SCV's position being that the separate and distinct PMCS re-pricing contract (Ex. C) should have been applied by UHC in determining the allowed amount rather than the separate and distinct mystery re-pricing formula that UHC unilaterally, wrongly implemented.

23.    Notwithstanding the existing PMCS contract / agreement in place, by way of naked EOB / Provider Remittance Advice dated April 13, 2018, on UHC letterhead, Defendant underpaid the subject claim, tendering $1,810.51 in relation to certain HCFA line items billed at $210,979.00, *see* ¶¶ 8-12, *supra*, predicated on some mystery re-pricing formula (falling outside Ex. A) implemented by UHC. More specifically, Defendant failed to properly pay (proper *amount*, that is) the codes billed by SCV in connection with the medical procedure.

24.    Defendant properly conceded coverage *via* the $1,810.51 partial claim payment in relation to certain HCFA line items billed at $210,979.00. In regards to the $1,810.51 paid, Defendant did not list any medical judgment related basis / plan document language interpretation (*e.g.*, medical necessity or experimental / investigational) for partial payment amongst the claim decision EOB codes (*see* Ex. E) relating to the HCFA line items placed at issue here. Rather, Defendant wrongly decided to underpay the subject claim seemingly predicated on an unsubstantiated mystery rate system falling outside of the plan document / insurance policy (Ex. A) itself and outside of the agreed to re-pricing contract attached as Ex. C.

25.    Following the adverse Defendant claim underpayment *via* UHC EOB dated April 13, 2018, appeals and / or reconsideration processes were carried out by SCV. To no avail, the unreasonably low claim underpayment decision ($1,810.51 paid in relation to $210,979.00 billed, *see* ¶¶ 8-12, *supra*) was upheld at each pre-suit turn. More specifically, as to the pre-suit exchanges between the parties:

(a)    May 30, 2018: SCV submitted a reconsideration request online;

(b)    June 2, 2018: UHC upheld payment amount ("claim processed appropriately");

(c)    June 8, 2018: SCV lodged a second reconsideration request;

(d)    June 13, 2018: undersigned counsel's letter to UHC advising of representation and requesting germane documentation / information (this June 13, 2018, letter is discussed in greater detail below);

(e)    June 30, 2018: UHC letter (authored by "Resolving Analyst," Sandeep S.) purporting to resolve a June 18, 2018, "appeal" advanced by undersigned counsel on SCV's behalf,[7] which such June 30, 2018, UHC letter concludes with an upholding of the initial claim decision and states that an optional second level of appeal was available if invoked within sixty days;[8]

---

[7] This reference to UHC receiving an "appeal" from undersigned counsel on June 18, 2018, must have been reference to undersigned counsel's June 13, 2018, letter, which was not an appeal. Given this June 30, 2018, UHC letter is the most informative carrier pre-suit correspondence (although still largely uninformative), a copy of this letter is attached hereto as **Exhibit H** and incorporated fully herein by reference.

[8] A few germane highlight's from UHC's June 30, 2018, letter include the following: (a) "Allowed Amounts are the amount [UHC] determine[s] that [UHC] will pay for Benefits;" *i.e.*, UHC was / is the sole decision-maker as to the amount of payment for SCV's medical services rendered to T.S. and UHC is the payor of such monies; (b) "When Covered Health Services are received from an out-of-Network provider, Allowed Amounts are determined, based on: * Negotiated rates

(f)    July 10, 2018: letter from undersigned counsel (on SCV's behalf) to UHC advising UHC that undersigned counsel's June 13, 2018, letter was a letter of representation and germane data request letter (not an appeal), reminding UHC as to the germane records request lodged in undersigned counsel's aforementioned June 13, 2018, letter, advising UHC that SCV would be appealing, and suggesting to UHC that any appeal "deadline" should be tolled until a reasonable time after UHC obliged records request;

(g)    August 29, 2018: SCV appeal letter *via* undersigned counsel;

(h)    September 10, 2018: UHC letter seemingly saying the same thing as UHC's June 30, 2018, letter. Maybe this was UHC's attempt at responding to undersigned counsel's / SCV's August 29, 2018, appeal, but this September 10, 2018, UHC letter still starts with referencing a June 18, 2018, "appeal" by undersigned counsel (even though, again, there was no such June 2018 appeal from undersigned counsel / SCV) and with referencing a June 30, 2018, appeal

---

agreed to by the out-of-Network provider and either us or one of our vendors, affiliates or subcontractors... ;" *i.e.*, PMCS is precisely the kind of "vendor[ ], affiliate[ ] or subcontractor[ ]" referred to here, and the June 30, 2018, UHC letter goes on to make clear that the re-pricing endeavor stops at the rate negotiated by UHC's vendor / affiliate / subcontractor. Distilled, this dispute concerning UHC's rate of payment to SCV regarding the medical services SCV provided to T.S. revolves around the rate structure of the third-party standalone re-pricing contract that is Exhibit C; (c) "[UHC] make[s] administrative decisions regarding whether the Policy will pay for any portion of the cost of a health care service you intend to receive or have received. [UHC's] decisions are for payment purposes only. ... We have the final authority to do the following: * Interpret Benefits and the other terms, limitations and exclusions set out in this Certificate, the Schedule of Benefits and any Riders and/or Amendments. * Make factual determinations relating to Benefits. We may assign this authority to other persons or entities that may provide administrative services for the Policy, such as claims processing;" *i.e.*, again, the determination of the amount of payment tendered to SCV for medical services provided to T.S. was UHC's determination to make, and UHC wrongly assigned the payment amount determination to a mystery vendor (who significantly underpaid) when there was already vendor agreement in place – the PMCS contract (at an 80% / 100% payment rate structure) attached hereto as Exhibit C.

decision date;

(i)    November 8, 2018: SCV's second appeal letter *via* undersigned counsel;

(j)    November 20, 2018: UHC's purported record production, consisting of four categories of materials, the vast majority of which (volume-wise) was the insurance policy (Ex. A) and a regurgitation of materials that SCV had submitted to UHC;[9]

(k)    December 4, 2018: UHC correspondence circling back around talking about document production, saying that records were forthcoming on a password protected CD. Such was not received by SCV;

(l)    December 8, 2018: UHC again says that the claim was processed correctly, after stating that UHC took another look at the claim because SCV had made a request for another look. Interestingly, in this UHC letter, UHC states that the payment amount was $9,342.00 (rather than the $1,810.51 actually paid);

(m)    October 9, 2019: email from a Ms. Bombard with UHC saying that she could have the claim re-processed to increase the payment amount to $16,874.19 (rather than the $1,810.51 actually paid). SCV has not received any

---

[9] This feeble "production" despite the comprehensiveness of requests made by SCV (*see* SCV's / undersigned counsel's July 10, 2018, letter, attached hereto as **Exhibit G** and incorporated fully herein by reference) and UHC's own acknowledgement of the comprehensiveness of documents SCV was entitled to receive. *See, e.g.,* Ex. H (stating, in pertinent part, the following under a "your additional rights" heading: "At no cost to you, you can ask for copies of any information that we used to make this determination such as: * Records * Communications * Evidence not included as part of the appeal * Internal rules used * Your plan benefits * Guideline or rules relied on * Explanation of our scientific or clinical determination * Diagnosis or treatment codes and their meanings * Other information relevant to your appeal. We [UHC] will send you [SCV] the information you asked for within thirty 30 calendar days of receipt").

monies from UHC other than the initial $1,810.51 payment.

26.    To this day, Defendant continues to keep SCV in the dark as to how a claim payment of $1,810.51 on a billed amount of $210,979.00 was arrived at and / or was legitimate, in particularly in the face of the re-pricing structure prescribed by the standalone contract (brokered by PMCS, UHC's vendor / affiliate / subcontractor) attached hereto as Exhibit C (which would / should have resulted in a six figure payment amount, *see, e.g.,* ¶ 11, *supra*) and in the face of UHC saying, on one occasion, that the payment amount should have been $9,342.00 (rather than $1,810.51) and in the face of UHC saying, on another occasion, that the payment amount could have been $16,874.19 (rather than $1,810.51); yet, UHC's refusing to produce the "guideline" or "rule" or the like (*see* n. 9, *supra*) upon which UHC's payment amount (whether that be $1,810.51 or $9,342.00 or $16,874.19) was based.

27.    UHC's failure to produce that which was requested in Exhibit G (most acutely, documentation showing how exactly UHC arrived at the unreasonably low payment amount at issue here – $1,810.51), notwithstanding UHC's acknowledgement that SCV was entitled to receive that which was requested in Exhibit G (*see, e.g.,* n. 9, *supra*), regrettably curtailed SCV's (and T.S.') valuable pre-suit remedies process (which such pre-suit mechanisms are designed to try to avoid lawsuits like this) by Defendant keeping SCV in the "evidentiary" blind. That which UHC did produce throughout the claim process (*e.g.*, EOB, Ex. E) was the epitome of naked / uninformative. Defendant's germane documentation

production failures compromised SCV's ability to make any sense of the amount of Defendant's claim payment.

28.    Again, if one looks at the EOB (which does not necessitate examination or "interpretation of" Ex. A), it is plain that coverage is not at issue here with respect to the HCFA line items that SCV places at issue in this litigation – Defendant properly conceded coverage *via* initial partial payment (albeit at the unreasonably low amount of $1,810.51). *See* Ex. E. And, again, as to the codes that SCV places at issue in this lawsuit, one can also look to the pre-authorization paperwork (which does not necessitate examination or "interpretation of" Ex. A) to see that coverage is not at issue here. *See* Ex. D at 8-10 (as stated earlier, the pre-authorization paperwork shows that the subject pre-authorization put coverage issues to rest, leaving only pricing issues with respect to the HCFA line items at issue in this case). Again, the sole issue here is one of payment amount.

29.    As to re-pricing, the insurance policy / plan document (Ex. A) provides that the re-pricing exercise starts and stops at a rate negotiated by one of UHC's vendors. *See, e.g.,* n. 8(b), *supra*. Here, such is the 80% / 100% payment rate structure developed by UHC's vendor called PMCS, which such rate structure SCV agreed to; *see* Ex. C; *i.e.*, not the mystery rate structure developed by another UHC vendor (unknown) that SCV did not agree to and that resulted in a payment amount of a mere $1,810.51. Which, here, would / should have resulted in an allowed amount (re-priced amount) of $180,417.80 on the $210,979.00 billed. *See, e.g.,* ¶ 11, *supra*.

30. Application of the PMCS re-pricing contract (Ex. C) requires zero interpretation of the insurance policy / plan document (Ex. A) language. The application of the PMCS re-pricing contract is straightforward and formulaic as to 80% rate of payment for non-implant HCFA line-items and 100% rate of payment for implant HCFA line-items. Put differently, application of the re-pricing formula set forth in the separate and distinct PMCS re-pricing contract attached as Ex. C does not relate this matter to the insurance policy / plan document.

31. Defendant's untenable implementation of its mystery re-pricing formula was sans SCV agreement.

32. Defendant wronged SCV in many ways, most notably by way of the significant underpayment. Defendant should have employed the PMCS re-pricing contract (Ex. C) already in place (*i.e.*, already agreed to between the parties) to assess a proper re-priced amount; but, instead, Defendant implemented a mystery re-pricing system (not agreed to by SCV) separate and distinct from Ex. A to arrive at the unreasonably low payment amount.

33. Under the PMCS re-pricing analysis (which, again, was re-pricing contract / agreement established by UHC that SCV actually agreed to, and unlike the mystery re-pricing formula that Defendant unilaterally employed here without SCV's agreement), Defendant should have used an 80% rate to calculate the allowed amount equaling $180,417.80 (which such amount is 80% of the non-implant HCFA line items that this lawsuit places at issue and 100% of the implant line item that this lawsuit places at issue). This is the amount that the assumed

patient responsibilities (capped at an annual out-of-pocket maximum) should have been deducted from. The $180,417.80 less Defendant's prior payment of $1,810.51 (which such prior payment already took patient responsibilities subject to the annual out-of-pocket maximum into consideration, which such UHC pre-determined patient responsibilities amount is not disputed by SCV) leaves an outstanding balance of $178,607.29 due and owing to SCV. This amount is exclusive of attorneys' fees, costs, interest, and / or extra-contractual exposure.

34.    SCV has suffered significant financial harm by way of owed medical services monies is in excess of $75,000.00, not including interest of attorneys' fees, costs, or interest, if, for examples, the negotiated, agreed to 80% / 100% payment rate system prescribed by UHC's third-party re-pricing vendor (PMCS) is honored / enforced as it should be, or even if rates prescribed by publicly available databases assessing the charges of providers of like kind within like geographies, like Agency for Health Care Administration ("AHCA"), were utilized in the re-pricing assessment.[10]

35.    SCV exhausted the pre-suit appeal process to the best of its ability, hindered by Defendant's wrongful refusal to provide administrative records / claim file / germane documentation, in an effort to accomplish Defendant's doing the right thing (*i.e.*, properly compensating SCV) sans litigation, to no avail. Hence, this lawsuit as SCV's regrettable last resort.

---

[10]    *See, e.g.*, http://www.floridahealthfinder.gov/LandingPages/HospitalASC.aspx and http://www.floridahealthfinder.gov/CompareCare/SelectChoice.aspx.

## COUNT I – BREACH OF RE-PRICING CONTRACT / AGREEMENT, EX. C (CLAIM UNDERPAYMENT)

SCV re-alleges Paragraphs 1 through 35 as if fully set forth herein, and further alleges as follows.

36.    At all material times to this action and in exchange for a valuable premium, Defendant provided health insurance to T.S. under the insurance policy / plan document (Ex. A).

37.    The subject medical services were covered under the insurance policy / plan document, as evidenced by, for examples, (a) Defendant's partial payment relating to same, (b) the UHC-issued EOB (Ex. E), (c) pre-authorization paperwork (Ex. D at 8-10) approving HCFA codes (Ex. D at 3) placed at issue here, and (d) *et cetera*.

38.    Defendant erred in deciding to not fully compensate SCV by only tendering a $1,810.51 underpayment in relation to $210,979.00 in billed charges predicated on Defendant's mystery re-pricing formula separate and distinct from Ex. A. As to all codes set forth on the HCFA (Ex. D at 3), Defendant should have honored the re-pricing contract (PMCS) included in Ex. C that SCV had actually already agreed to with UHC. Defendant's payment amount comes nowhere close to the re-pricing formula prescribed by PMCS. *See, e.g.,* ¶¶ 11 and 33, *supra*. Defendant's payment amount is accordingly in breach of the subject re-pricing contracts (Ex. C).[11]

---

[11] And, again, at minimum, Defendant's payment amount also does not come anywhere close to "reasonable and customary" rates within the subject geography. Again, that kind of information

39.    Defendant's $178,607.29 payment shortage (*see* ¶ 33, *supra*) does not constitute a usual, customary, reasonable re-priced / allowed amount no matter how one views the situation. First, the third-party re-pricing vendor who UHC contracts with (PMCS) has established SCV's UCR based re-priced / allowed amount at 80% of billed charges (at least pursuant to PMCS in relation to non-implant HCFA line-items). Second, unbiased public databases (*e.g.*, AHCA, see n. 10 above) assess the rates of providers of like kind within like Florida geographies and make clear that Defendant's unsubstantiated unreasonably low payment does not find support amidst UCR rates relating to providers of like kind within like Florida geographies.

40.    Defendant, among other things, had a duty to properly investigate the subject medical services, adjust / investigate the subject SCV claim relating to such services, and fully compensate SCV in relation to same. Defendant failed SCV in these regards (most notably with respect to its failure to pay the monies due and owing under the subject re-pricing contract), which breached the subject re-pricing contract / agreement and / or otherwise violated Florida law. Such underpayment even runs afoul of the insurance policy's / plan document's geographical assessment.

41.    As a direct, foreseeable, and proximate result of Defendant's breach of obligations under the re-pricing contract (Ex. C), SCV has suffered and

---

can be easily found in the public domain through very reputable sources, *see* n. 10, *supra*.

continues to suffer damages.

42.    SCV has no other adequate remedy other than this lawsuit to address the injuries it has suffered as a result of Defendant's underpayment of the monies owed to SCV in relation to the subject T.S. medical services.

43.    As a further result of Defendant's refusal to fully compensate SCV, SCV has been forced to retain legal counsel to represent it in this matter and is accordingly entitled to recover its reasonable attorneys' fees and costs pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement.

WHEREFORE, Plaintiff, Surgery Center of Viera, LLC, requests the entry of judgment against Defendant, UnitedHealthcare Insurance Company, for liability and for damages including, but not limited to, (a) past-due contractual monies owed in relation to the subject medical services and all associated awardable accrued interest, (b) attorneys' fees pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## JURY DEMAND

44.    Plaintiff, Surgery Center of Viera, LLC, demands a trial by jury on all issues so triable as a matter of right.

Dated:  April 12, 2023.

Respectfully Submitted,

**POLI, MOON & ZANE, PLLC**
7016 Charleston Shores Blvd., #8
Lake Worth, Florida  33467
(602) 857-8180 (o); (561) 834-2504 (f)

/s/ Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**
Fla. Bar No. 41103
jgreyber@pmzlaw.com
heatherc@pmzlaw.com
*Attorney for Plaintiff*